230 N.W.2d 33 (1975)
In re ESTATE of Archibald G. BUSH, a. k. a. A. G. Bush, Deceased.
Warren SPANNAUS, Attorney General of Minnesota, on Behalf of the BENEFICIARIES OF the BUSH FOUNDATION, Appellant,
The Bush Foundation, Appellant,
v.
Herschel S. ARROWOOD and Mary Jane Dickman, Co-Executors of the Estate of Archibald G. Bush, Deceased, and Smith, Blomquist, Vitko and Rummel, Respondents.
Nos. 44953 and 44954.
Supreme Court of Minnesota.
May 9, 1975.
*35 Warren Spannaus, Atty. Gen., Peter W. Sipkins, Sol. Gen., Richard G. Mark, Asst. Sol. Gen., St. Paul, for Spannaus, and others.
Gray, Plant, Mooty & Anderson and Edward J. Callahan, Jr., Minneapolis, for Bush Foundation.
O'Connor & Hannan and Joe A. Walters, Frank J. Walz, and Charles D. Reite, Minneapolis, for respondents.
Considered and decided by the court en banc.
YETKA, Justice.
Appeal is taken by the Bush Foundation (the foundation) and the Attorney General of Minnesota from judgment entered December 27, 1973, in Ramsey County District Court awarding executors and attorneys fees and from the denial of motions for a new trial. Respondents seek review of the judgment. We affirm.
This appeal is the latest chapter in the history of bitter controversy and protracted litigation surrounding the probate of the estate of the late Archibald Bush (hereinafter called Mr. Bush or decedent). Unfortunately, this court has had occasion to become familiar with the history of this controversy. In the recent opinion of In re Estate of Bush, Minn., 224 N.W.2d 489, 491 (1974) certiorari denied, ___ U.S. ___, 95 S.Ct. 1454, 43 L.Ed.2d 768, filed March 31, 1975, this court set forth a rather detailed statement of that history with the hope that we would "see an end to this protracted and expensive litigation." As the instant appeal so vividly shows, that hope was not to be realized.
Stated generally, this appeal is addressed to the question of the fees to which the executors, Herschel Arrowood and Mary Jane Dickman, and their counsel, Smith, Blomquist, Vitko & Rummel (Smith et al.), may receive from the estate for services rendered in its administration.
On April 21, 1965, Mr. Bush executed a will designating the Bush Foundation as residuary legatee to which the bulk of his considerable fortune[1] was to pass. However, that designation contained the limitation that if the foundation was unable to take, "or if bequests to it be not deductible for Federal estate tax purposes," the residue would go to the A. G. Bush Institute. The will further provided that if neither the foundation nor the institute were able to take, or if bequests to them were not deductible for Federal estate tax purposes, then the executors were to form a nonprofit corporation as recipient of the residue.
The will contained no provision for Mrs. Bush.[2] However, the will recited that the disposition was pursuant to an agreement between Mr. Bush and Mrs. Bush.[3] Attached to the will was a consent of spouse instrument executed by Mrs. Bush, in which she expressly ratified the provisions of her husband's will.
Respondents, Herschel S. Arrowood and Mary Jane Dickman, were named as executors in the will. The record shows that both were highly trusted business associates of decedent.
Subsequent to Mr. Bush's death, the executors secured the services of First Trust Company of St. Paul, Minnesota, to act as fiscal agent for the estate. The employment of a trust company was expressly provided for by the will.
The will was admitted to probate on March 2, 1966. Arrowood and Dickman were appointed executors.
*36 The executors then retained the services of David Roberts and Walter Trenerry to serve as counsel for the estate, although the executors did not wish to hire these individuals.[4] Rather, it was the alleged pressure and threats applied to the executors by Roberts and by Mrs. Bush which prompted that decision. Subsequently, Clifford Lee and Phillip Stringer were engaged to assist Roberts and Trenerry.
Immediately thereafter, problems between the attorneys and the executors began to arise.[5] Without engaging in a detailed discussion on this point, the record discloses testimony that the attorneys had conflict of interests between their relationship to the estate and their relationship to Mrs. Bush.[6]
During the period from March through August 1966, Mrs. Bush threatened to renounce her husband's will and take her statutory widow's share. This culminated in a settlement whereby Mrs. Bush waived her right to renounce in return for $2,100,000 from the estate and an agreement by the executors to retain Roberts, Lee, Trenerry, and Stringer as counsel for the estate.[7] The probate court approved that settlement in August 1966. It is to be noted that the executors were acting without the advice of "neutral" counsel during this time, although they had unsuccessfully attempted to obtain advice from the firm of Briggs & Morgan.
Although not presented to the probate court, part of the settlement was the reorganization of the foundation into a bicameral board which split the board of directors into two divisions, each having veto over actions proposed by the other.[8] In effect, the bicameral structure of the board resulted in a deadlock of opposing factions and eventually became unworkable.
Thereafter, matters proceeded to a point where the executors, upon advice of counsel (Roberts et al.), filed in probate court a first intermediate account and a petition for partial distribution of earned income in the sum of $2,500,000 to the foundation. The purpose of this petition was to take advantage of a purported income tax deduction that, according to Roberts and the other attorneys, would have been lost had not payment been made prior to January 1, 1967.[9] Arrowood testified at trial that he harbored some concern over that opinion and the possible inability of the foundation to "take" under the will.[10]
The probate court approved the petition on December 14, 1966. However, prior to that date, Arrowood, through Haskins & Sells, the accountants of the estate, requested a ruling from the Internal Revenue *37 Service (IRS) as to whether payment to the legatee prior to December 31, 1966, was required in order to secure the desired tax deduction. On December 23, 1966, the executors received a revenue ruling that such payment was not required. The executors then unsuccessfully attempted to advise Mr. Trenerry of the IRS ruling.
Upon receipt of the ruling and the unavailability of their present counsel, the executors brought the matter to Mr. Smith (of Smith et al.) who agreed to bring the matter before the probate court. That firm was then engaged to represent the estate.
Mr. Bertrand Poritsky (of Smith et al.) drafted a petition for amendment of the December 14, 1966, order. Amended orders to effectuate this petition were also drafted, and were signed by a judge of the probate court who was in Colorado at the time, thereby resulting in the designation of these orders as the "snowbank orders." In effect, these new orders withdrew the court's declaration of the foundation as residuary legatee and the order for partial distribution. Rather, the foundation was designated as "contingent residuary legatee," and the orders stated that it is not in the best interests of the estate to make partial distribution to the foundation at that time.
On February 8, 1967, Mrs. Bush and the "B" directors of the foundation filed an appeal in district court from these "snowbank orders." However, in face of opposition by the "A" directors, that appeal was not pursued.
On June 6, 1967, the "B" directors filed a petition in probate court for partial distribution, or for declaratory judgment, to name the foundation as residuary legatee. Action on that petition was continued during that summer and fall, over which period of time negotiations for closing the estate were conducted.
In December 1967, the "A" directors petitioned the probate court to vacate the 1966 settlement with Mrs. Bush.[11]
In January 1968, Mrs. Bush and the "B" directors filed an action in district court, naming as defendants the "A" directors, the executors, and the attorney general. Specifically, the plaintiffs in this action sought a declaration that the foundation be declared the sole residuary legatee. Additionally, plaintiffs sought the removal of three of the four class "A" directors (including Arrowood) and the removal of the executors. The class "A" directors counterclaimed for the setting aside of the 1966 settlement, particularly seeking elimination of the bicameral organization of the board and restitution of the $2,100,000 paid to Mrs. Bush.
On March 22, 1968, the probate court ordered partial distribution to the foundation.[12] Pursuant thereto, some 656,957 shares of stock in Minnesota Mining and Manufacturing (3M) were distributed. The total market value of this distribution was approximately $72,019,000.
In April 1968, the IRS assessed a tax deficiency upon the estate. The major ground advanced by the IRS in support of the deficiency was the possibility of Mrs. Bush's successful renunciation of her husband's will.
In June 1968, Mr. Arrowood resigned as an "A" director of the foundation.
In October 1968, the attorney general filed his pleadings in the district court litigation, alleging among other things that the bicameral board of directors was illegal and unworkable.
*38 In November 1968, pursuant to a motion by the executors, the probate court dismissed the petition of the class "A" directors seeking to set aside the 1966 settlement.
In March 1969, the executors filed an answer in the district court litigation, alleging among other things that the bicameral board of the foundation was illegal and unworkable.
In May 1969, the probate court approved the third intermediate account and ordered the second partial distribution, consisting of 485,436 shares of 3M with a market value of $49,514,000. This left 500,000 shares of 3M stock remaining in the estate.
In September 1969, the district court litigation was settled by stipulation, the major outgrowth of which was the elimination of the bicameral board and the waiver by Mrs. Bush of her right to renounce. Mrs. Bush was allowed to retain the $2,100,000 paid her pursuant to the 1966 settlement.[13]
In May 1970, the probate court entered a third partial distribution of $2,000,000 to the foundation and allowed the fourth intermediate account.
In November 1970, Mrs. Bush was declared incompetent in Florida state court proceedings. Mr. Roberts was appointed as one of her guardians.
In October 1971, the guardians of Mrs. Bush filed renunciation of her husband's will in probate court. That litigation ultimately culminated in this court's decision of In re Estate of Bush, Minn., 224 N.W.2d 489 (1974), certiorari denied, ___ U.S. ___, 95 S.Ct. 1454, 43 L.Ed.2d 768, filed March 31, which affirmed the decision declaring the 1971 purported renunciation to be of no force and effect.
In November 1971, a fifth intermediate account was filed in probate court.
In December 1971, respondents petitioned the probate court for fees pursuant to Minn.St.1971, § 525.49, and expenses. The relief sought was $500,000 by each executor (less amounts received), plus expenses of $5,011.90. Smith et al. sought to recover $710,000 (less amounts received), plus expenses of $3,766.03.[14] The matter was heard in probate court,[15] which awarded the requested amounts, plus 6 percent interest from the date of the order awarding fees, September 22, 1972.
Appellants appealed to the Ramsey County District Court pursuant to Minn.St. 525.71 and 525.72. Trial was commenced on December 3, 1973. The district court affirmed the award ordered by the probate court. However, the district court expressly declined to award interest.
The following issues are raised on this appeal:
(1) Does Minn.Const. art. 1, § 4, require jury trials as of right in appeals to district court pursuant to Minn.St. 525.72?
(2) If a jury trial is not afforded as of right, did the district court abuse its discretion in refusing to grant appellants' motion for a jury trial?
(3) Under applicable statutes, may an award of compensation to executors and attorneys for services rendered to the estate be predicated solely upon the size thereof?
(4) Does the amount awarded by the trial court as compensation to Smith et al. constitute an abuse of discretion?
(5) Do the amounts awarded to the executors by the district court constitute an abuse of discretion?
(6) Are respondents entitled to interest on their awards from the date of the probate court's order?
*39 1-2. Subsequent to filing its appeal in district court, the foundation moved for a jury trial. That motion was denied.
Minn.St.1971, § 525.49, provides for the award of attorneys and executors fees in probate court in amounts deemed just and reasonable by that court. Minn.St. 525.71(15), expressly provides for appeal to the district court from such rulings. Minn.St. 525.72 states in relevant part:
"* * * All appeals other than from the allowance or disallowance of a claim [see, Minn.St. 525.71(5)] shall be tried by the court without a jury, unless the court orders the whole issue, or some specific question of fact involved therein, to be tried by a jury or referred." (Italics supplied.)
The foundation argues that its right to trial by jury is guaranteed by Minn.Const. art. 1, § 4.[16] This assertion presents an issue of first impression.
This court has held the effect of art. 1, § 4, to be a recognition (i.e., a constitutional incorporation) of the right to trial by jury as it existed at the time the state constitution was adopted in 1857. Landgraf v. Ellsworth, 267 Minn. 323, 126 N.W.2d 766 (1964); Breimhorst v. Beckman, 227 Minn. 409, 35 N.W.2d 719 (1949).
Prior to 1857, the territorial legislature had provided for appeal to district court from certain judgments or orders of a probate court.[17] However, no express right to a jury trial in such proceedings was granted until 1889, at which time the following provisions were enacted:
"Sec. 260. In all cases of appeal from the allowance or disallowance of a claim against the estate, the district court shall on or before the second day of the term direct pleadings to be made up as in civil actions, but no allegations shall be permitted except such as are essential to the specific matter to which the appeal relates, and thereon the proceedings shall be tried; all questions of law arising on the cause shall be summarily heard and determined upon the same pleadings; the issues of facts shall be tried as other issues of fact are tried in the district court.
"Sec. 261. All other appeals shall be tried by the court without a jury, unless the court orders that the whole issue or some specific question of fact involved therein be tried by a jury or referred."[18]
The foundation relies upon the case of State ex rel. Larson v. Probate Court, 204 Minn. 5, 283 N.W. 545 (1938). In that case, the critical issue was whether a contested claim for fees rendered by an attorney to the executrix of an estate in her representative capacity could be litigated in probate court. This court held in the negative stating that no such jurisdiction existed in the probate court.[19]
We believe that the Larson case has no application here. The issue in this case is not whether the probate court had jurisdiction to entertain the question of attorneys and executors fees for services rendered to the estate. Rather, the issue is whether there is a constitutional right to jury trial in an appeal from such proceedings. As noted above, no such right to jury trial existed when our constitution was enacted, and, thus, under Landgraf v. Ellsworth, supra, and Breimhorst v. Beckman, supra, the foundation is not entitled to a jury trial as of right.
The foundation alternatively contends that the district court abused its discretion *40 by denying the motion for a jury trial.
In the memorandum accompanying his order denying the motion for a jury trial, the trial court stated:
"From the arguments and discussions of counsel, it is apparent that the within case could well involve a long and complicated trial, covering many matters similar to or in the nature of an accounting procedure. Under all the circumstances herein, neither trial by jury nor an advisory jury is warranted, in the opinion of the Court, and said motions have therefore been denied."
The extensive record in context with the issues to be decided in these proceedings strongly supports the court's views. Moreover, contrary to the foundation's veiled suggestion,[20] the trial court's familiarity with the entire history of the Bush estate litigation, and in particular the court's experience as presiding judge in the previous district court litigation, placed him in a superior posture to weigh the exhibits and testimony and to arrive at the decision ultimately rendered in this case.
In any case, Minn.St. 525.72 vests the trial court with discretion to grant or deny a request for a jury trial in such cases. This court has traditionally extended great deference to the exercise of discretion by our trial courts and will reverse such decisions only in cases of clear abuse.[21]
3. Appellants assert that an award of compensation to executors and their counsel for services rendered for the estate should not be predicated upon the size of the estate.
Two statutory provisions are relevant:
Minn.St.1971, § 525.49, provides in part:
"Every representative shall be allowed his necessary expenses incurred in the execution of his trust and shall have such compensation for his services as the court shall deem just and reasonable. An attorney performing services for the estate at the instance of the representative shall have such compensation therefor out of the estate as the court shall deem just and reasonable."
Minn.St.1971, § 525.515, provides:
"Notwithstanding any law to the contrary, an attorney performing services for the estate at the instance of the representative shall have compensation therefor out of the estate as the court shall deem just and reasonable. In any proceeding under this section, fair and reasonable attorney's fees shall be based upon time spent, the complexity of any problems involved, and the value of the estate shall not be the controlling factor."
Although the legislature has now emphasized its displeasure with the size of the estate as a consideration for awards of compensation by its amendment of Minn.St. 1971, § 525.515,[22] the applicable version of that provision may be fairly read to prohibit such awards, i.e., where size is the sole factor.
The record shows that the size of the estate was not the sole factor considered by the trial court. Rather, a variety of factors were considered in reaching the amounts awarded. Therefore, it may be said that the instant case does not present the occasion *41 for this court to consider § 525.515, as amended by L.1974, c. 442, art. 9, § 3.
4. Before moving to a discussion of the various subissues presented herein, a summary of the considerations set forth in the memorandum accompanying the trial court's findings may be helpful.
(1) The size of the estate precluded past practice from presenting guidance in this matter.[23]
(2) Comparison with fees awarded in estates of similar size from other jurisdictions was useful in putting the matter in proper perspective.
(3) The size of the estate may have caused some of the unique problems faced by respondents.
(4) The affairs of the estate and those of the Bush Foundation could not be separated. Any attempt to do so would be an impossible exercise in "theoretical legal gymnastics." "Because of the personalities involved, the two became inexorably entwined by a series of incidents, culminating in the District Court litigation entitled [Bush v. Arrowood]."
(5) That litigation was described as "acrimonious."
(6) "* * * Since the Foundation was the residuary legatee under the will, and therefore concerned with all matters which would involve the administration of the Estate of A. G. Bush, it was inevitable that the Executors became involved, albeit indirectly, in the affairs of the Foundation."
(7) From the onset of the administration, the executors were beset with pressure from Mrs. Bush. Most prominent was her threatened renunciation of the will of her husband.
(8) The executors were also beset with pressure from various attorneys, including their own.
(9) The executors were beset with pressure from all factions of the board of the foundation.
(10) The problems were vast and probably required the exercise of extreme caution by the executors. The court cannot be critical when the financial results are considered.[24]
(11) Thus, the estate was unusual by virtue of its size, bitter hostilities, and the lengthy and complex litigation surrounding it.
(12) The executors have at all times had a heavy responsibility, which they have "conscientiously discharged."
(13) The executors and their counsel have been accused of unnecessarily prolonging the administration. Yet, when the executors sought to be removed as parties from the district court litigation [Bush v. Arrowood], they were opposed by the directors of the foundation.
(14) Since mid-1970, the closing of the estate has been prevented by:
A. The IRS tax deficiency claim, and
B. the question of fees.
(15) No evidence was presented by appellants to show that the award of $500,000 to each executor is excessive.
(16) Relative to attorneys fees, the trial court considered the guidelines set forth in the case of In re Living Trust Created by Atwood, 227 Minn. 495, 502, 35 N.W.2d 736, 741 (1949):
"* * * In determining the reasonableness of attorneys' fees, the character, ability, and experience of the attorneys, the amount involved, the time necessary to prepare for trial, the responsibility assumed in connection therewith by counsel, the difficulties of the propositions *42 involved, the results obtained, and the amount customarily charged for services of like character are all to be considered."
(17) The resolution of the district court litigation was "obviously" beneficial to the estate because it was "unquestionably" essential to the completion thereof.
(18) "According to the Code of Responsibility of the American Bar Association, factors to be considered in determining reasonableness of the fee include the following:
(1) Time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that work will preclude other employment by the lawyer.
(3) Fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The experience, reputation and ability of the lawyers performing the services."
The court then concluded as follows:
"* * * As previously stated herein, because of the size of this Estate the standard fee cannot be applied. On the other hand, while the value of the estate may not be the controlling factor, it certainly must be considered by the Court, together with the time spent, the nature of the assets, the complexities presented by this unique and unusual matter, the reputation and experience of counsel, and the custom and practice in the community. All of these factors are included in the Statement of Principles (Ex. A-46) which was approved by the Council of the A. B. A.'s section of Real Property, Probate and Trust Law.
"Because of all the complexities surrounding this case, it is perhaps inevitable that differences of opinions should arise as to whether certain services were necessary, whether the estate should have been closed, and whether the fees charged were adequate or excessive. This entire matter has been the particular concern of this Court for almost five years, and the Court shares the view that it should be brought to a conclusion at the earliest possible date.

"While the Court might not agree with every decision made or action taken by the Executors and their attorneys, nevertheless it has been a remarkable performance under adverse circumstances." (Italics supplied.)
It is to be borne in mind that the trial court had the benefit of first-hand knowledge of the prior district court litigation, as well as of the instant proceedings.
The scope of review of compensation awarded pursuant to Minn.St.1971, § 525.49, was stated by this court as follows:
"* * * [T]he allowance of compensation for attorneys' fees in probate proceedings rests largely in the discretion of the probate court; and that the reasonable value of such services is a question of fact." In re Estate of Baumgartner, 274 Minn. 337, 346, 144 N.W.2d 574, 580 (1966).
However, In re Estate of Weisberg, 242 Minn. 150, 152, 64 N.W.2d 370, 372 (1954), contains the following caveat to the above quotation:
"* * * The courts have a duty to prevent dissipation of estates through the allowance of exorbitant fees to those who administer them."
Thus, it may safely be concluded that the ensuing facts should be viewed in a light favorable to the parties who have prevailed in the lower court.
The evidence presented in the district court consisted of numerous documentary exhibits, most notably, respondents submitted detailed breakdowns showing the time spent by Smith et al. on various categories of work for the executors. In addition, various firm members of Smith et al. testified in order to explain and to supplement the information set forth in those *43 exhibits. Of course, these witnesses were subject to vigorous cross-examination. Other witnesses called by the respondents included Arrowood and Dickman, whose testimony dealt with the various problems encountered during administration, and a summary of the work performed. Needless to say, these witnesses were also closely cross-examined. Respondents also obtained the testimony of a practicing attorney with extensive probate experience in Minnesota, who expressed his opinion as to the reasonable value of the services rendered to the estate by Smith et al.
Appellants, however, called no witnesses to contest the claims asserted by the executors and called only one expert witness to contradict the claim of Smith et al.[25]
At trial, appellants took issue with certain services performed, most notably, the time spent in the district court litigation and the time spent compiling the documentary evidence in support of the claims for compensation, both for Smith et al. and for the executors. This line of attack attempted to prove that such activities did not benefit the estate and were not therefore to be the basis of a charge against the estate.
In a more general manner, appellants attempted to establish that the delay in closing and the litigation were prompted by respondents' actions, i. e., but for the actions of respondents, the estate would have been closed in relatively prompt fashion, absent the history of controversy and litigation that has been the byword of the Bush estate administration.[26]

THE BUSH v. ARROWOOD LITIGATION
Appellants contend that the internal problems of the foundation were of no concern to the estate. They contend that if the executors had not obtained the "snowbank orders" which suspended an early declaration of the foundation as residuary legatee, the litigation in district court would not have had the major impact upon the administration of the estate that ultimately resulted.
Respondents assert that the bicameral organization of the foundation's board of directors was directly relevant to its ability to take under the will, and, thus, it was of major and rightful concern to the executors. Likewise, the threat of renunciation by Mrs. Bush posed a problem that could have reduced the size of the decedent's estate by tens of millions of dollars, thereby losing those funds to the Minnesota foundation in favor of a Florida based foundation benefiting residents of that state, rather than the State of Minnesota, contrary to the intent of the testator.
It is beyond question that the primary duty of the executors of an estate is to distribute the assets according to the will of the decedent. The will of Mr. Bush expressly required that the foundation be able to take, and that the bequests be deductible for Federal estate tax purposes. In view of the extremely large amount of money in question, it is difficult to fault the executors for exercising extreme caution in that regard. Not only was there a possibility for personal liability for wrongful distribution, but also, in view of the extremely suspect activities of Roberts and Lee concerning control of the foundation,[27] it was prudent for the executors to at least wonder if Mr. Bush's wishes would be vindicated by placing the control of his fortune in unworthy hands.
The position taken by the attorney general in the district court litigation regarding the bicameral organization question and the eventual outcome of that litigation bears witness to the viability of the ability to take question. Moreover, the opinion of the trial *44 judge regarding that question cannot be discounted.
Appellants take issue with the timing of the "snowbank orders" in an attempt to discredit the motives and conduct of the executors regarding the "ability to take" question. However, it is to be borne in mind that the executors were virtually without effective counsel until the firm of Smith et al. was engaged. Moreover, the pressures brought to bear by Mrs. Bush further led to the understandable confusion that was experienced by the executors at that time.
In summation, we hold that the district court's decision on this subissue is supported by sufficient evidence.
Once it is determined that the participation of the executors in the district court litigation was proper, it follows that their counsel may recover for services rendered in that litigation.

TIME SPENT BY SMITH ET AL. IN REGARD TO THE QUESTION OF FEES
The question of whether such fees may be recovered is one of first impression in this jurisdiction.
As a general rule, in order to recover it must be established that such services inure to the benefit of the estate. In re Estate of Baumgartner, 274 Minn. 337, 144 N.W.2d 574.
Of the approximately 1,500 hours spent by Smith et al. on the fees question, some 260 hours were spent in regard to the question of executors fees. Additionally, approximately 165 hours of the 1,500 hours was spent in regard to claims filed by Roberts, Lee, and Stringer for fees. Apparently, the balance of the 1,500 hours was spent in discussing and in documenting the firm's own fees.
It is difficult to envision any direct benefit to the estate from the services at issue. Rather, it would seem that such efforts more directly benefited the executors and counsel as individuals.
It may well be that the exhibits compiled as the result of the 1,500 hours at issue were of great assistance to the court in ruling on the overall claims asserted in the courts below. However, this does not detract from the fact that the purpose of those exhibits was to secure a private benefit, and, in a sense, the instant action of necessity places Smith et al. in a posture adverse to the estate.
Smith et al. asserts that the time spent was necessitated by the extreme difficulty encountered in its efforts to secure prior partial payment from the estate due to the unreasonable degree of opposition of appellants. However, this does not per se indebt the estate.
The time spent with regard to the claims of Roberts, et al., was quite clearly beneficial to the estate and should be recoverable therefrom.

FACTORS CONSIDERED BY THE COURT IN AWARDING ATTORNEYS FEES
As noted above, the district court in the memorandum accompanying its decision cited various factors considered in reaching its ruling. Putting aside the 1,500 hours, discussed above, the record clearly shows that for a period of 6 years Smith et al. represented the executors of a vast estate in circumstances that may be fairly described as extremely trying.
Appellants argue that the award was excessive because most of the legal work for the estate had been completed prior to Smith et al.'s entry into the fray. However, there is ample evidence in the record showing in considerable detail the extensive legal work performed by Smith et al. on behalf of the estate.
Appellants point out that if the amount awarded is divided by the hours spent, the result is that Smith et al. would receive compensation far in excess of the normal *45 hourly rate charged by even the most senior members of that firm. This, appellants conclude, is excessive.
However, to establish that raw time spent is the sole factor to be considered would do violence to the express terms of Minn.St.1971, §§ 525.49 and 525.515 and also to Minn.St.1974, § 525.515, prior decisions of this court,[28] and the realities of practice.[29]
The better view is to allow a variety of factors to be considered and weighed by the court in light of the particular facts at hand. This would appear to have been the logical intent of the legislature, since the applicable statutes, expressly vest the probate courts with wide discretion in these matters.
In the instant case, the court could well have, and did, find the size important, not as an inflexible yardstick, but rather as a major causal factor for the problems that have surrounded the administration of the estate. Size also affected the responsibility assumed by not only the attorneys but, perhaps more importantly, by the executors.
It is noteworthy that if success under adverse conditions is to be considered, as it was, respondents qualify therefore. Of record they have prevailed in all litigation in which they were parties.
Additional discussion of this issue is unnecessary. Upon careful review of the record, the award is justified.
It should be pointed out, also, that the attorneys have carried much of the expense themselves over the years because they have only been partially paid. To do this, when a large portion of any fee is office overhead and when inflation is rampant and without interest on their money, amounts to a considerable reduction in itself.
5. Many of the considerations set forth in the above discussion apply with equal force to appellants' contention that the award to the executors was excessive. Additionally, several comments are worthy of mention.
Unlike their counsel, the executors did not place detailed time records in evidence to support their claim. What they did instead was to manage the vast assets of the estate in such fashion that, if there had been no partial distributions to the foundation, the corpus of Mr. Bush's fortune would have doubled.
The executors devoted their full-time efforts to the estate for approximately 4 years,[30] working under pressure that included not only the hostility and trauma of constant litigation and controversy, but also making crucial decisions regarding the maintenance of the 3M stock in the estate during a period of falling market value of that stock.
Perhaps the most significant point regarding this issue is the fact that appellants offered no testimony at trial to contradict the executors claim for compensation. If the amounts claimed were so excessive, one wonders why appellants did not come forward with expert testimony.
Appellants assert that it was the executors who initiated the acrimony in the administration of the estate. This conclusion is most strongly rebutted by the probate judge who quite frankly stated that Roberts and Lee were responsible for the problems that plagued the estate.[31]
*46 There is some indication that Mr. Bush intended that the executors receive $500,000 each, although this fact appears in the record in the form of the probate judge's recollection of a nonrecorded conversation with Mr. Roberts.
At this stage of the proceedings, it is most difficult to find grounds upon which this court could justify a reduction of the amounts awarded to the executors and attorneys. In view of the rather narrow scope of review applicable herein, it is perhaps advisable to defer to the judgment of two competent lower court judges who were intimately familiar with the Bush estate.
6. By their notice of review, respondents seek interest from the date of the probate court's order, September 22, 1972, which ordered the payment of 6-percent interest on the amount awarded from the date thereof.[32]
Minn.St. 525.714 provides in part:
"Such appeal [brought pursuant to § 525.71] shall suspend the operation of the order, judgment, or decree appealed from until * * * the district court shall otherwise order." (Italics supplied.)
Minn.St. 525.73 provides:
"When the appellant fails to prosecute his appeal, or the order, judgment, or decree appealed from or reviewed on certiorari is sustained, judgment shall be entered in the district court affirming the decision of the probate court. Upon the filing in the probate court of a certified transcript of such judgment, the probate court shall proceed as if no appeal had been taken. If the order, judgment, or decree reviewed is reversed or modified, the district court shall remand the case to the probate court with directions to proceed in conformity with its decision. Upon the filing in the probate court of a certified transcript of such judgment, it shall proceed as directed by the district court."
Respondents urge that the district court judgment affirmed (per § 525.73) the suspended (per § 525.714) probate court order in its entirety, including the interest portion thereof.
Appellants contend that the district court's intentional refusal to award interest amounted to a modification. Furthermore, appellants also assert that Minn.St.1971, § 525.49 does not allow the award of interest, and thus the probate court was without authority to do so.
Once we find that the district court assumed jurisdiction, it was in effect substituted for the probate court with a trial de novo in much the same manner as in appeals from an award of commissioners in eminent domain proceedings. Since the district court made no award of interest, no interest is recoverable.
Were it not for the fact that the trial court disallowed interest, and also the fact that the attorneys have financed the cost of attorneys fees in all the litigation to datea significant portion of such fees being office overhead going back to 1966and for the further obvious loss of value of any present day award due to inflation, this court would be inclined to reduce the amount of attorneys fees. The purpose being to disallow that portion of the attorneys fees which was attributable to time spent by Smith et al. in compiling documentary exhibits in support of their request for fees. However, loss of interest and inflation have reduced the present value of the judgment by a much greater amount and we, therefore, decline to order a remittitur.
The trial court is, therefore, affirmed in all respects.
SHERAN, C. J., and OTIS, J., took no part in the consideration or decision of this case.
NOTES
[1] At the time of his death, the value of the assets contained in the estate was appraised at $126,875,868.07.
[2] The will did provide that Mrs. Bush could occupy her husband's house in Florida without charge for so long as she might wish.
[3] Mrs. Bush was a very wealthy person in her own right.
[4] Miss Dickman, for example, testified that she and Mr. Arrowood had attempted to hire other counsel, but Mrs. Bush actively opposed that action.
[5] Mr. Arrowood characterized the relationship as "stormy."
[6] The executors were of the opinion that Roberts had encouraged and assisted Mrs. Bush in threatening to renounce the will and seek her statutory share of the estate. In fact, Miss Dickman stated that the renunciation question was raised by Roberts one day after she and Mr. Arrowood were appointed executors.

The executors were also of the opinion that the attorneys were motivated by the desire to seize control of the estate for personal gain. Indeed, that opinion was shared by the probate court. It is interesting to note that the will and consent were drafted and witnessed by Roberts.
[7] Mr. Arrowood opposed the latter term. However, he acquiesced under pressure from various sources, including Miss Dickman and Mr. Holtz from the First Trust Company.
[8] See, also, In re Estate of Bush, Minn., 224 N.W.2d 489, 492 (1974), certiorari denied, ___ U.S. ___, 95 S.Ct. 1454, 43 L.Ed.2d 768, filed March 31, 1975.
[9] In regard to the advice received from Roberts, et al, on the tax question, Miss Dickman testified that Roberts' position on that question changed several times prior to the drafting of his written opinion. In fact, the executors had to obtain the intervention of Mr. Trenerry and Mr. Holtz of First Trust Company of St. Paul in order to obtain this written opinion.
[10] The probate judge recalled that Arrowood did express his concern regarding the "ability to take" question during that time.
[11] The "purpose" of that petition, according to respondents, was to bring the attorney general into the matter in order to resolve the foundation's problem, i. e., the elimination of the bicameral organization of the board of directors.
[12] The probate court justified its order on grounds that administration of the estate was substantially completed and substantial assets were ready for distribution, and that "time and completion of administration overrode the other considerations and compelled distribution."
[13] See, In re Estate of Bush, Minn., 224 N.W.2d 489 (1974), certiorari denied, ___ U.S. ___, 95 S.Ct. 1454, 43 L.Ed.2d 768, filed March 31, 1975.
[14] The amounts requested are for services rendered over the entire life of the estate, absent the future rendition of extraordinary service to the estate.
[15] The proceedings were extensive, involving numerous exhibits and extensive testimony.
[16] "The right of trial by jury shall remain inviolate and shall extend to all cases at law without regard to the amount in controversy."
[17] Rev.Stat. (Terr.) 1851, ch. 69, art. 3, § 43.
[18] L.1889, ch. 46, §§ 260 and 261.
[19] In State ex rel. Seifert v. Smith, 260 Minn. 405, 413, 110 N.W.2d 159, 165 (1961), this court commented on State ex rel. Larson v. Probate Court, 204 Minn. 5, 283 N.W. 545 (1938), and noted that "it may well have prompted the enactment of L.1939, c. 270, § 6 [which was part of Minn.St.1971, § 525.49]."
[20] In its brief, the foundation suggested that the trial judge's position of presiding judge in the district court litigation between the class A and class B directors "might well have colored his views."
[21] Simchuck v. Fullerton, 299 Minn. 91, 216 N.W.2d 683 (1974); Schroeder v. Jesco, Inc., 296 Minn. 447, 209 N.W.2d 414 (1973); Kosloski v. Jones, 295 Minn. 177, 203 N.W.2d 401 (1973); Ryan v. Ryan, 292 Minn. 52, 193 N.W.2d 295 (1971).
[22] L.1974, c. 442, art. 9, § 3, added the following language to Minn.St.1971, § 525.515: "(d) Unless previously agreed to in writing by the testator it is declared to be against the public policy of Minnesota for an award of attorney fees and representative fees for services rendered to an estate to be based on a percentage of the estate."

However, the August 1, 1974, effective date of this amendment precludes its application in the instant proceedings.
[23] The trial court noted that the estate was five times larger than any estate previously probated in Minnesota.
[24] During the administration, there has been a net income of $12,566,000 [to date of trial in the district court]. The assets turned over to the foundation total $86,450,000, with 1,000,000 shares of 3M stock yet to be distributed.
[25] Respondents raised some question as to the qualifications of this witness, Professor Robert A. Stein, most notably, his lack of probate experience in Minnesota.
[26] See, note 6, supra.
[27] The probate judge certainly agreed with the question of Mr. Roberts' motives.
[28] In re Living Trust Created by Atwood, 227 Minn. 495, 35 N.W.2d 736 (1949).
[29] In re Chieffo's Estate, 86 N.Y.S.2d 343 (Sur.1948) mod., 274 App.Div. 1061, 85 N.Y. S.2d 920, time was held not to be a controlling factor since some lawyers were more efficient than others. See, also, Fraiman Estate, 408 Pa. 442, 184 A.2d 494 (1962), and Annotation, 58 A.L.R.3d 317, 326, where it is noted that the "timeclock method * * * would certainly be improper and result in completely inadequate fees in large estates and disproportionately high fees in modest ones."
[30] The executors now devote only part time efforts to the estate.
[31] See, note 27, supra.
[32] As noted above, the district court expressly refused, without explanation, to grant interest to respondents from the date of the probate court's order of September 22, 1972.