James E. **HAVERSTOCK** and the First National Bank of Minneapolis, Plaintiffs,

v.

R. J. **WOLF** and David S. Warden, Defendants.

Civ. No. 4–77–457.

United States District Court, D. Minnesota, Fourth Division.

June 6, 1980.

John Q. McShane, Gray, Plant, Mooty, Mooty, & Bennett, Minneapolis, Minn., for plaintiffs.

R. J. Wolf, San Rafael, Cal., pro se.

Paul G. Neimann, Weise & Cox, Minneapolis, Minn., for David S. Warden.

MacLAUGHLIN, District Judge.

This is a statutory interpleader action brought by plaintiffs, the Co-Administrators C.T.A. of the Estate of Lee Warden, as disinterested stakeholders of a $29,500.00 fund pursuant to 28 U.S.C. § 1335(a). The Court previously dismissed plaintiffs from the action pursuant to 28 U.S.C. § 2361, and bonds and currency in excess of $29,500.00 have been deposited with the Clerk of Court. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1335 and 28 U.S.C. § 1332. The following memorandum constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

The $29,500.00 fund is claimed by attorney R. J. Wolf as compensation for legal services rendered pursuant to a written contingent fee agreement entered into on February 4, 1975, by Wolf and David Warden, his client. The contingent fee agreement was entered into after David Warden, a Minnesota resident, sought out R. J. Wolf,

an accomplished California trial attorney who formerly practiced in Minnesota, to represent him in connection with a will contest which concerned the validity of two wills executed by Lee Warden, the father of David Warden.

On January 23, 1958, Lee Warden executed a will which left the bulk of his estate in trust in equal shares to his two children, David Warden and Meredith Warden. In a second codicil to that will in 1965, Lee Warden appointed his wife Olga Warden, James Haverstock and Frank Plant to act as trustees of the trusts existing under the will and as executors of the will. Olga Warden died in 1967, and Lee Warden subsequently entered a nursing home and was placed under the guardianship of Frank Plant and David Warden, as co-guardians, in 1968. Frank Plant is a Minneapolis attorney and a member of the Minneapolis law firm of Gray, Plant, Mooty, Mooty & Bennett (hereinafter Gray, Plant), and was a family friend and neighbor of the Wardens.

During the time he was under guardianship and at the request of David Warden, Lee Warden executed a new will which provided that upon the death of Lee Warden, David Warden would receive his share of the estate outright rather than in trust, as contemplated by the first will. This second will was executed on October 16, 1968, and R. J. Wolf served as Lee Warden's attorney and authored the documents. The will was witnessed by Bruce Hartigan and Ronald Schumeister, Minneapolis attorneys who worked in the same office building as R. J. Wolf. In a codicil to the 1968 will, the testator indicated his desire to have David Warden appointed executor and trustee under the will, and if he failed to so act, for R. J. Wolf to assume the role of executor and trustee. The only significant changes between the 1958 and the 1968 wills were that David Warden would receive his share of the estate outright rather than in trust upon the death of Lee Warden, and that David Warden would serve as the sole executor and trustee.

The guardianship arrangements of Lee Warden continued until 1970, when the Hennepin County Probate Court found, at the request of David Warden, that the fees charged by Frank Plant in connection with the guardianship were unreasonable. Thereafter, Frank Plant resigned as the co-guardian of Lee Warden and was replaced by the First National Bank of Minneapolis as co-guardian. In this adversary proceeding before the probate court, R. J. Wolf (who practiced law in Minneapolis at the time) appeared on behalf of the estate, and in effect represented both Lee and David Warden's interests. For his legal representation, R. J. Wolf was compensated out of the proceeds of the estate pursuant to Minn.Stat. § 525.49 (1971).[1] David Warden was fully aware that at the time of the fee dispute in connection with the guardianship, R. J. Wolf was paid his legal fees out of the estate in accordance with Minnesota law. At the conclusion of the hearing, Judge Peterson of the probate court indicated that his rulings in the estate matters would not give one of the Warden children any advantage over the other, and that they would share equally. Again, David Warden was fully aware of Judge Peterson's inclinations.

Lee Warden died on January 28, 1975. At the time of his father's death David Warden was 41 years old. During the late 1960's through 1975, David Warden lived rent free in the family's Minneapolis home, and his entire income consisted of a $500.00 per month trust fund stipend and some

---

1. This provision, now codified in Minn.Stat. § 524.3–720, allows attorneys' fees to be awarded to an attorney who performs services on behalf of the estate at the instance of the representative. In addition, the statute allows a person named as executor in a will who prosecutes proceedings in good faith for the purpose of admitting the will to probate to recover reasonable attorneys' fees out of the estate whether successful or not in his efforts. A beneficiary under a will who is named as executor under that will can recover attorney fees even if unsuccessful provided he acts in good faith. *In re Healy's Estate*, 247 Minn. 205, 76 N.W.2d 677 (1956). David Warden was named as an executor under the 1968 will of Lee Warden.

meager income generated on occasion from the sale of his paintings. During this time frame, David Warden received little income from the sale of paintings, and had little in the way of savings. He did, however, have significant experience in negotiating transactions with respect to his artwork and had amassed over 300 college level academic credits.

After Lee Warden's death, David Warden initially telephoned R. J. Wolf in California, and ultimately requested that Wolf come to Minneapolis to discuss representing him in connection with a potential dispute over the validity of the second will executed by Lee Warden. At the time of this initial conversation, Warden informed Wolf that he anticipated trouble from Frank Plant in connection with the validity of the second will, as the position of the Gray, Plant firm was that Lee Warden was legally incompetent during the time he was under guardianship. Wolf concurred in this view, and agreed to come to Minneapolis to discuss his representation of Warden.

Shortly after Wolf arrived in Minneapolis, on February 3rd and 4th, he and David Warden had discussions with respect to certain details of the impending will contest and Wolf's fee in the event Wolf was to represent Warden. At this time, Wolf and Warden discussed some of the potential difficulties with respect to the litigation, and how the Gray, Plant firm would be compensated should that firm formally challenge the validity of the 1968 will. Wolf explained to Warden that Frank Plant, as the named executor of the 1958 will, could attempt to have that will admitted to probate and thereby recover attorneys' fees incurred in the will dispute for the Gray, Plant firm pursuant to Minn.Stat. § 525.49 (1971). Under the statute, Wolf explained, the attorneys' fees for the Gray, Plant firm would be payable out of the estate, and thus David and Meredith Warden would in effect split any court award of attorneys' fees to the Gray, Plant firm should there be a will contest. In addition, Wolf advised Warden that this statutory alternative as to

fees would in all probability be unavailable insofar as attorneys' fees for Warden were concerned because the Hennepin County Probate Court, or any court, would not compel Meredith Warden to pay one half of David Warden's fees in addition to her share of the attorneys' fees charged by the Gray, Plant firm. In part this was so, Wolf reasoned, because of Judge Peterson's prior pronouncements regarding the equal treatment to be afforded David and Meredith Warden. Wolf also informed Warden that the Gray, Plant firm's reliance on this statute could serve as settlement leverage to secure Meredith Warden's support, as a will contest was not in her best interests, as it could only cost her money. After being informed of the statute's role and Wolf's assessment, David Warden indicated his agreement that insofar as his attorneys' fees were concerned, recovery under the statute was not a viable option. Thus, prior to the time the contingency fee agreement was entered into, David Warden had knowledge of the statutory alternative of Minn. Stat. § 525.49 insofar as fees were concerned, and had rejected it as a valid alternative.

As noted, discussions between Wolf and Warden with respect to Wolf's fee took place on February 3rd and 4th in Minneapolis. Warden asked Wolf whether Wolf would represent him in any will contest on the basis that he would be paid at the end of the case and not paid at all should Warden be unsuccessful in acquiring his share of the estate outright. Wolf responded by stating that such an agreement was a contingency fee agreement and that he would accept such employment for 15% of David Warden's share of the estate if Warden obtained his share outright rather than in trust. David Warden verbally indicated his agreement. At that time, Wolf indicated to Warden that a will contest would be lengthy and complicated, and that he envisioned problems in persuading a court or jury that Lee Warden possessed testamentary capacity when he executed the 1968 will. According to Wolf,[2] he and Warden

---

2. David Warden's account of this conversation is that Wolf offered him a choice between an

hourly basis and the 15% contingency fee agreement. During his testimony, David

did not discuss Wolf's taking the case on a time basis, as Wolf was aware of the sources and amounts of Warden's income at the time, and because such an arrangement would have been impossible in light of Warden's financial condition.

After these discussions, Wolf arranged to have an agreement typed at a local attorney's office, and on February 4, 1975, both Wolf and Warden signed the agreement. In essence, the agreement provides that if the 1968 will was admitted to probate and became distributable to Warden, or alternatively should Warden receive his share of the estate outright rather than in trust, Wolf would be compensated in the amount of 15% of the property received by Warden under the will or outright, plus expenses. Consistent with Warden's express desire, Wolf was to receive nothing in the event he was unsuccessful in obtaining Warden's share of the estate outright. Wholly at the insistence of Warden, the following provision was added in ink at the bottom of the agreement: "In the event this matter is concluded by compromise within the next 30 days, then the aforementioned contingent fee shall be 10%."[3] As the co-guardian for his father, David Warden was aware of the extent and nature of his father's property, and knew at the time the agreement was consummated what 15% of one half of Lee Warden's estate amounted to in monetary terms.

Shortly after the contingency fee agreement was entered into, Wolf began his efforts at seeking to obtain Warden's bequest outright by meeting with Robert Helland, an attorney from the Gray, Plant law firm in order to determine whether a will contest was imminent and to raise the possibility of compromise. At that meeting, Wolf was informed by Helland that it was probable that the Gray, Plant firm would contest the validity of the 1968 will on the theory that Lee Warden lacked testamentary capacity in 1968 and on the basis of David Warden's undue influence. Another factor of concern to those at the Gray, Plant firm was David Warden's status as trustee of the trust. Both Helland and Plant were concerned over Warden's lack of qualifications to be a trustee and over the conflict which resulted from David Warden's status as both trustee and remainderman under Meredith Warden's trust. According to the testimony of Robert Helland, in February and March of 1975 there was a valid and subsisting dispute over the validity of the 1968 will, and litigation appeared likely. However, after a series of meetings, telephone conversations and exchanges of different written and verbal proposals between Wolf, Helland and others, the parties involved in the estate of Lee Warden tentatively agreed to settle the matter so as to allow David Warden to receive his bequest outright. While no formal will contest proceedings were ever commenced, the exploration and adoption of the settlement alternative removed the prospect of what appeared to all those involved to be a lengthy and expensive will dispute.

In the written settlement agreement dated April 7, 1975, the parties concerned agreed not to object to the probate of the 1968 will of Lee Warden, and thus David Warden received his share of the estate outright. In turn, David Warden and R. J. Wolf agreed to decline to act as both executor or trustee under the will, and were replaced by James Haverstock and the First National Bank of Minneapolis as co-administrators C.T.A. of the decedent's estate and as co-trustees of the trust for Meredith Warden Sebesta. The agreement also provided that no party would object to the following fees: $14,000.00 to the First National Bank of Minneapolis as co-adminis-

---

Warden was inconsistent, evasive, and unpersuasive. All of this leads the Court to conclude that Warden's version of what occurred in entering into the contingency fee agreement and the subsequent assignment is less than credible.

**3.** The addition of this provision, wholly at the insistence of David Warden, is hardly the work of a person who was so "bereaved" he "would have signed a lot of things" at the time, as Warden testified. *See* footnote 2, supra.

trator; $7,000.00 to James Haverstock as co-administrator; and, $14,000.00 to the attorneys for the co-administrators (the Gray, Plant firm). David Warden's resignation as executor and trustee was entirely consistent with his expressed desires, as he had no interest in serving as trustee because of his intention to live in Europe and pursue his career as an artist. Further, David Warden instructed Wolf to have the fees of the co-administrators and attorneys specified in the agreement, in order to avoid the fee problems that had surfaced in the past.

After the settlement agreement,[4] Wolf and Warden met in Wolf's hotel room, where Warden signed an assignment directing the co-administrators to pay to R. J. Wolf the sum of $29,500.00 out of Warden's distributable share of the estate. This $29,-500.00 figure represents the total of Wolf's expenses and the 15% of David Warden's bequest due under the contingency fee agreement. In 1977, some two years after these contractual arrangements occurred, David Warden first indicated his belief that R. J. Wolf was not entitled to the $29,500.00 fee.

Warden's position in this litigation is that the contingent fee agreement violates the public policy of the State of Minnesota, that the agreement and the assignment were obtained through fraud and overreaching, that the agreement is unconscionable and unreasonable in amount, and is based upon inadequate consideration.

*Public Policy and Contingency Fee Agreements in Will Contests*

As noted, Warden argues that contingency fee agreements in will contests should be held unlawful and contrary to the public policy of the State of Minnesota. In this regard, Warden points out that under Min-

nesota law, it is contrary to public policy for an award of attorneys' fees for services rendered to an estate to be based on a percentage of the estate, and that in awarding attorney fees for services rendered to an estate, the size of an estate, while a legitimate factor, cannot be controlling. Minn.Stat. § 525.515 (1974); *In re Estate of Bush*, 304 Minn. 105, 230 N.W.2d 33 (1975). *See also, e. g.* Code of Professional Responsibility, DR2–106(C) (no contingency fee agreements in criminal cases); *Burns v. Stewart*, 290 Minn. 289, 188 N.W.2d 760 (1971) (no contingency fee agreements in divorce cases as such agreements would undermine the state policy to discourage the procurement of divorce, fees may be oppressive, and the fee may frustrate the court's award in the decree). Minnesota law also provides as a general rule, in Minn.Stat. § 549.01:

> A party shall have an unrestricted right to agree with his attorney as to his compensation for services, and the measure and mode thereof  .    . . .

The Court has determined that the public policy of the State of Minnesota does not bar the use of contingency fee contracts between attorney and client in a will contest in which the client is a prospective contestant. Contingency fee contracts between attorney and client are valid under most circumstances, as the legislature has indicated that a client possesses an unrestricted right to contract with his attorney as to the "measure and mode" of his attorney's compensation. Minn.Stat. § 549.01; *Continental Cas. Co. v. Knowlton*, 305 Minn. 201, 232 N.W.2d 789 (1975). Several reasons support the Court's conclusion. The legislature's preference that the size of an estate not be a controlling factor in an award of attorneys' fees for services ren-

---

4. Again, David Warden's account is different. Warden testified that when he and Wolf met before the settlement meeting on April 7, 1975, Wolf threatened to withdraw after Warden protested the amount of his fee. Warden testified further that he felt so "pressured" by this that he signed the written assignment directing the co-administrators to pay R. J. Wolf $29,500.00 out of Warden's share of the estate. Warden therefore argues that the assignment was pro-

cured by duress. Wolf denies that he ever threatened to withdraw.

Again, the Court is convinced that Wolf's account is more accurate. *See* footnote 2, *supra.* Therefore, the assignment was not procured under duress. Even assuming it was, however, such a state of affairs would not effect the validity of the contingency fee agreement, as the assignment is simply a method of payment under the contingency fee contract.

dered to an estate cannot logically be extended to bar contingency fee agreements between attorneys and clients in will contests. Minn.Stat. § 525.515 (1974). In will contests, the attorney generally acts on behalf of an individual client rather than an estate. In the normal estate, a res already exists out of which fees may be paid, and therefore the risk incurred by attorneys in a contingency fee arrangement is totally absent. Moreover, the size of an estate is clearly a legitimate factor which may be considered in awarding fees to an attorney who performed services for an estate, it simply cannot be the controlling factor. *In re Estate of Bush*, 304 Minn. 105, 230 N.W.2d 33 (1975). Likewise, the size of an anticipated recovery or the estate is an operative factor in contingency fee agreements, but it is not controlling, as the perceived difficulty, the risk involved in recovery and potential lengthy and arduous litigation are also factors of great importance.

Nor are the factors which operate to ban contingency fee agreements in criminal or divorce cases relevant to a contingency fee agreement between an attorney and a prospective contestant in a will contest. In the will contest context, contingency fee agreements would not encourage undesirable results from a public policy standpoint, such as divorce, and would not tend to frustrate the testator's intent in the disposition of his property. Cf. *Burns v. Stewart*, 290 Minn. 289, 188 N.W.2d 760 (1971). In the view of the Court, the availability of a contingency fee arrangement to a will contest will provide a necessary alternative to other fee arrangements, and this flexibility will contribute to achieving the paramount interest in probate matters of effectuating the testator's intent as expressed in his will(s).

*Absence of Consideration*

▆▆▆ As noted, Warden argues that there is no consideration which supports the contingency fee agreement. In this regard, Warden contends that because R. J. Wolf was the draftsman and executor under the 1968 will, he was under a duty to file the will and defend it against challenge. Thus, Warden reasons that because Wolf is under

a legal duty to defend the will and procure the probate of the will, there is no consideration because Wolf was already legally obligated to perform. This argument must be rejected for a number of reasons. First of all, Warden was named as executor under the 1968 will, and Wolf was only nominated to act as executor in the event of Warden's resignation. Moreover, no legal duty devolves upon the draftsman of a will or a person nominated as executor to defend the validity of a will or procure its probate in every instance. *In re Myler's Estate*, 133 Minn. 278, 158 N.W. 395 (1916); *see* Minn. Stat. § 525.221 (1974) (person having custody of a will shall deliver it to the court); Minn.Stat. § 525.23 (1971) (any executor *may* petition the court to admit the will to probate). Thus, no foundation exists for Warden's argument, as Wolf was under no such legal duty or obligation, and therefore adequate consideration supports the contingency fee agreement.

*Fraud, Overreaching and Unconscionability*

▆▆▆ As noted, contingent fee contracts are generally valid unless they are unconscionable or are procured by fraud or overreaching. *Continental Cas. Co. v. Knowlton*, 305 Minn. 201, 232 N.W.2d 789 (1975). In making the determination of whether such an agreement is procured by overreaching or is so unconscionable as to be unenforceable, some of the relevant factors include the client's familiarity with attorney-client relationships, the client's age and education, the responsibility assumed by the attorney, the perceived difficulty in achieving the sought after result, the result obtained by the attorney, other work done for the client for which the attorney is not compensated, the nature of the dispute, the client's ability at the time the contract was entered into to pay on a time basis, the client's preference for a contingency fee agreement, the conduct of the attorney, and the reasonableness of the fee. *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866 (9th Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Continental Cas. Co. v. Knowlton*, 305 Minn. 201, 232 N.W.2d 789 (1975); *Kittler & Hedelson v.*

*Sheehan Properties, Inc.*, 295 Minn. 232, 203 N.W.2d 835 (1973); *Krueger v. State Department of Highways*, 295 Minn. 514, 202 N.W.2d 873 (1972); *Holt v. Swenson*, 252 Minn. 510, 90 N.W.2d 724 (1958). In *Kittler & Hedelson v. Sheehan Properties, Inc.*, 295 Minn. 232, 236-37, 203 N.W.2d 835, 839 (1973), the Minnesota court noted the factors relevant to a determination of the reasonableness of a fee:

> (1) The time and labor required; (2) the responsibility assumed; (3) the magnitude of the principal amount; (4) the results obtained; (5) the fees customarily charged for similar services; (6) the experience, character, reputation, and ability of counsel; (7) the fee arrangement; (8) the circumstances under which the services were rendered; (9) the nature and difficulty of the proposition involved; (10) the doubtful solvency of the client and the apparent difficulties of collection; (11) the anticipation of future services; and (12) the preclusion of other employment.

In Minnesota, to prove fraud it must be established that there was a false representation or omission by a party of a past or existing material fact which is susceptible of knowledge or clearly ascertainable, made either with knowledge of the falsity of the representation or omission or without knowing whether it was true or false, with the intention to induce another to rely thereon, and injury results from such reliance. *Control Data Corp. v. Garrison*, 305 Minn. 347, 233 N.W.2d 740 (1975); *Burns v. Valene*, 298 Minn. 257, 214 N.W.2d 686 (1974).

■ Based on all the factors outlined above and all the circumstances, the Court has concluded that the contingency fee agreement in issue is valid and enforceable, is not the product of overreaching or fraud, and is not unconscionable. In making this determination, reference must be made to the circumstances as they existed at the time when the contract was entered into.

*Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866 (9th Cir.), cert. denied, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

The underlying thread of Warden's arguments is the proposition that there was no actual dispute over the validity of the 1968 will and that R. J. Wolf knew or should have known that there was no realistic prospect of litigation. This proposition is simply inaccurate. All the testimony, even David Warden's and Robert Helland's, indicated that principals in the Gray, Plant firm were of the opinion that the 1968 will of Lee Warden was invalid due to his incompetence, and that Frank Plant was prepared to challenge its admission to probate. Based on this knowledge, David Warden, a well educated self-employed artist who had some experience in negotiating contracts and with attorney-client relationships,[5] sought out an able and accomplished California trial lawyer to represent his personal interests in a will dispute. Warden's purpose in seeking out Wolf's representation was due in part to Wolf's success in the fee dispute with the Gray, Plant firm in connection with the guardianship of Lee Warden. Although Wolf suggested to Warden that he obtain local counsel, Warden indicated that he wished to retain Wolf, and expressly indicated his preference for a contingency fee agreement. *See Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866 (9th Cir.), cert. denied, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). The preference for this contingency fee agreement on the part of Warden was mainly due to his financial condition, as the income from his paintings and the $500.00 monthly income from a trust was manifestly insufficient to pay Wolf on a time basis.

Nor is the fee charged in this case unreasonable. Uncontradicted expert testimony was presented that it was the customary practice in Minnesota insofar as will contests were concerned for attorneys and

---

5. A part of this experience stems from Warden's involvement in the guardianship fee dispute over Frank Plant's legal fees. This experience undoubtedly created ill will between those involved from the Gray, Plant firm and David Warden. This ill will was also a relevant factor insofar as predicting whether a will contest was imminent in February of 1975.

clients to utilize contingency fee arrangements. The operative percentage in these agreements ranged from 25% to 50% of the client's anticipated recovery, depending on the difficulty of the case. It is readily apparent that the 15% fee charged in this case is well within, and even below, customary ranges. Moreover, Wolf assumed the considerable risk of not being paid for his efforts should there be no recovery, and the outcome of any litigation on the subject of testamentary capacity or undue influence could simply not be predicted in light of Lee Warden's wavering mental condition in 1968.

In agreeing to represent David Warden, Wolf assumed the substantial responsibility of attempting to obtain Warden's bequest outright, which was Warden's paramount goal. The result reached in this case is in every respect perfectly consistent with David Warden's central objectives. The settlement agreement resulted in Warden obtaining his share of the estate outright, and freed him from the obligations of executor and trustee so he could pursue his art career. Wolf acted prudently in attempting to reach a compromise at an early stage, and while he did not expend a substantial amount of time over the two month period, his efforts instigated and resulted in an agreement consistent with the best interests of his client. *See Krueger v. State Department of Highways*, 295 Minn. 514, 202 N.W.2d 873 (1972). Moreover, Wolf's efforts in achieving an early settlement preserved his client's share of the estate, as a lengthy and costly will contest would in all probability have resulted in a court approved award of attorneys' fees to the Gray, Plant firm, half of which would indirectly be paid out of David Warden's share of the estate.

Further, the Court has concluded that Wolf made no misrepresentations in the contract formation or assignment discussions, and that Warden was fully aware of all alternatives in terms of fees. While the

Court has indicated its concern over the potential applicability of Minn.Stat. § 525.-49 (1971),[6] Warden was made aware of the existence of this alternative by Wolf in their discussions leading up to the contingency fee agreement. Both Wolf and Warden agreed that this statutory alternative as to attorneys' fees would be unavailable in light of Judge Peterson's prior statements concerning the equality of treatment to be afforded David and Meredith Warden. In any event, Wolf would not have agreed to represent Warden on the basis of an arguably unavailable and hypothetical court approved award of attorneys' fees under Minn.Stat. § 525.49, and thus this alternative cannot be considered a reasonable one.

In conclusion, the contingency fee agreement and assignment entered into by the parties are both valid and enforceable. Consequently, R. J. Wolf is entitled to recover the sum of $29,500.00.

Accordingly, IT IS HEREBY ORDERED that the Clerk of Court release and pay over to R. J. Wolf the sum of $29,500.00, that any and all claims to said sum on the part of David Warden be dismissed, and that the remainder of all funds on deposit with the Clerk of Court be remitted to plaintiffs James Haverstock and the First National Bank of Minneapolis as Administrators C.T.A. of the Estate of Lee Warden.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**6.** The Court, upon motion of R. J. Wolf, reopened this proceeding for the purpose of taking evidence on the issue of disclosure of the alternative as to attorneys' fees under Minn. Stat. § 525.49 (1971).