## McKENZIE CONSTRUCTION, INC., Plaintiff

v.

## DESMOND L. MAYNARD, Defendant

Civil No. 80/61

District Court of the Virgin Islands

Div. of St. Thomas and St. John

September 14, 1983

CHARLES S. WAGGONER II, ESQ., St. Thomas, V.I., *for plaintiff*

ALBERT A. SHEEN, ESQ., Christiansted, St. Croix, V.I., *for defendant*

O'BRIEN, *Judge*

## MEMORANDUM OPINION

In this nonjury case which was tried to the Court, an angry corporation sued the attorney who represented it in a matter with the

Government of the Virgin Islands, claiming that the contingent fee charged by the attorney was excessive and unreasonable. While the Court is uncomfortable with the result, and while a different contractual arrangement between the parties may have been preferable, the Court will not, in the circumstances of this case, disturb the agreement which it finds was freely and voluntarily reached between the corporation and its former attorney.

## I. FACTS

In 1977, the plaintiff herein ("McKenzie"), won the government contract for renovation of the Frederiksted Hospital in St. Croix. This work was of great importance to the government because of the medical needs of the people of the western end of St. Croix, and the political value to be derived from completion of the renovation of this historic site. McKenzie hired subcontractors and worked on the project until May 12, 1978, when it was terminated.

Upset with the termination, McKenzie retained the services of an attorney who brought an injunction action in court. That effort failed. McKenzie then met with the defendant, ("Maynard"), and they discussed retention of Maynard as counsel to McKenzie. Apparently, McKenzie felt that it had completed a greater percentage of the work on the hospital than it had been paid for, and it also considered that it had a claim for loss of profits. It also wanted to go back on the job.

On November 22, 1978, the parties entered into a written retainer agreement under which Maynard was to receive one third of any sums he was able to obtain from the government in favor of McKenzie. As of that date, McKenzie had received $217,000 of the total $627,000 contract price, or 34%. It maintained that it had completed at least 60% of the total, which if correct would mean that it had at least another $160,000 coming under the contract.

McKenzie also owed a considerable amount of those funds to subcontractors. In fact, one of the reasons for the termination was the failure to keep payments to subcontractors current. There is a dispute, however, whether McKenzie told Maynard about amounts owed to subcontractors at the time they entered into the retainer agreement. Maynard testified that he did not know the extent of the debts to subcontractors, nor was he fully cognizant of the financial condition of McKenzie. However, Maynard also testified that when McKenzie's president, James King, came to his office in November 1978, the corporation was on the verge of bankruptcy and unable to pay its bills.

In fact, according to Maynard, that is why they agreed to a contingency fee arrangement rather than a straight hourly charge. McKenzie had no funds to pay the hourly charge or the expenses associated with a potential lawsuit.

It seems clear, then, that Maynard was well aware of the desperate financial condition of McKenzie, and it is hard to believe that he was not also aware that part of the reason for this desperate financial condition was a large debt to the subcontractors.

In any event, Maynard went to work for McKenzie. And, after a year of prodding and wheedling, he obtained a settlement satisfactory to McKenzie. The corporation received a settlement of $195,887.46, together with $5,000 toward its attorney's fees. Maynard then calculated his one third fee and came up with the sum of $65,295.00 owed to him, together with an additional $1,474.25 for expenses.

When McKenzie's president King appeared at Maynard's office in January 1980, and was confronted with Maynard's calculation, he was enraged. He took the position that (1) he had never agreed to pay one third, had never read the retainer agreement and did not receive a copy until that very day and (2) Maynard did not produce what he promised, i.e., to help him get back on the project, and to obtain the profits McKenzie allegedly lost by reason of termination.

To Maynard, "a deal was a deal." He claimed he had worked patiently and overcome heavy resistance on the part of the government to any payment at all. He testified that the government did not believe the percentage of completion was anywhere near McKenzie's claimed 60–65%, and that much of the work was shoddy. Nonetheless, Maynard asserted, he was able to get McKenzie far more in a settlement than it had anticipated. Although he offered to shave a small portion of the fee, he insisted on payment pursuant to the contingency fee agreement. He had succeeded, he insisted, where others had failed.

McKenzie considered a fair fee to be $15,000 to $16,000. At trial, Maynard's time sheets indicated $4,000 worth of time involved in the matter. Agitated and dissatisfied, King of McKenzie left Maynard's office, marched to the office of another attorney, and this action was launched.

## II. DISCUSSION

A. *Was a Contingent Fee Appropriate?*

The first question we face is whether in the circumstances of this

210

case a contingent fee arrangement between the parties was appropriate. Certainly it was allowed under the Code of Professional Responsibility to which attorneys in the Virgin Islands are bound under 5 V.I.C. App. V, R. 57(e) (1982). The Code permits such an arrangement except in criminal cases, though a contingent fee is greatly discouraged in domestic relations cases.

■ But the inquiry does not end there. A contingent fee contract is valid and enforceable only if it is fair, just and reasonable. It must be made in good faith, without suppression of or reservation of fact or of apprehended difficulties, and without undue influence. 7A C.J.S. Attorney and Client § 316 (1980). We deal with those matters in a subsequent section of this opinion.

When McKenzie approached Maynard, it was near bankruptcy. It had not paid its previous attorney. It could not have paid Maynard his hourly fee even if it had been agreed upon. It had a claim for a large sum of money which could create the pie from which a fee could be sliced. It was logical for Maynard to recognize a contingent fee as the ultimate means of payment. We do not place any credence on the testimony of James King, president of McKenzie, that he had no idea he was involving his company in a one-third contingent fee contract. He was an experienced negotiator, he had been in the contracting business all his adult life, and in the Virgin Islands since 1961. He was no neophyte in dealings with lawyers, contracts or the tug and pull of litigation and its uncertainties.

His testimony that he did not even see the agreement until the day the money was to be paid over to him is difficult to accept. He had had other dealings with Maynard in which an hourly fee agreement was entered into without any dispute. He conceded in his testimony that Maynard had handed him the contingent fee agreement and stated that this was the only way he (Maynard) would take the case. Thus, it is clear, King knew what he was doing, and what he was doing was entering into an agreement to pay Maynard one third of what Maynard was able to collect for McKenzie.

■ Therefore, in answer to the question whether a contingent fee arrangement in this circumstance was appropriate, the answer is that it was. The more difficult task is to determine whether the size of it was clearly excessive.

B. *Was the Contingent Fee Clearly Excessive?*

■ The Code of Professional Responsibility cited earlier, and more particularly DR 2-106(A) and (B), provide that an attorney

211

shall not enter into an agreement that is clearly excessive, and it lists certain factors to consider. They are:

1) The time and labor required, and the difficulty involved, together with the skill necessary.

2) The likelihood that this work precludes other employment for the lawyer.

3) Whether the fee is in the range of that customarily charged in this community.

4) The amount involved and the results which were obtained.

5) The time limitations imposed by the client or the situation the lawyer faces.

6) The nature and the length of time of the professional relationship between the attorney and the client.

7) Whether the fee is fixed or contingent.

The criteria listed above are also discussed in some detail in Havestock v. Wolf, 491 F.Supp. 447, 454 (D. Minn. 1980). In that case, it was held, and this Court agrees, that the reasonableness of the fee is to be determined on the basis of the circumstances which existed at the time the àgreement was entered into.

We have already found that the contingent fee was appropriate under the circumstances. A one-third arrangement on a contingent basis is common in this jurisdiction, although more common in tort matters than in a contract debt collection situation such as the case at issue. A sliding percentage scale is common in some debt collection situations.

What Maynard accomplished for McKenzie was the collection of more money than he expected, without the need for litigation, and without any offset by the government as to its own claim of McKenzie's shoddy workmanship. By that same token, Maynard convinced the government to accept his estimate of the percentage of completion (65%) as opposed to its own estimate (varying up from about 48%).

What Maynard did not accomplish, and what McKenzie wanted very badly, according to King, was to be allowed back on the job. But any hope by McKenzie that, after all the disharmony and distrust that had been created, that it would be permitted to return and finish the work, was illusory at best. No one with McKenzie's construction experience could seriously consider that this would occur.

Maynard's efforts on McKenzie's behalf, if charged on an hourly basis, would probably have been worth about $4,000. But Maynard

212

did not know this when he undertook the representation. What he did know was that another lawyer had begun the effort on McKenzie's behalf and taken a strong adversarial tack, seeking an injunction and other similar relief. That attorney failed in that particular effort and Maynard, being an experienced attorney, knew that the government's initial success probably emboldened it to think that its ultimate legal position was very favorable. In addition, as stated earlier, Maynard knew that McKenzie had not paid the attorney retained earlier because of a lack of funds. Eventually, Maynard himself paid the attorney the amount due in order to obtain critical documents in that attorney's file.

■ Clearly the results obtained were very favorable to McKenzie, and they were obtained without, as stated earlier, a lengthy, drawn-out law suit. Maynard successfully reversed the earlier strategy of confrontation, and worked with the government to solve the controversy by negotiation. He sensed that the government wanted to resolve its conflict with McKenzie because it also wanted to retain another construction company to complete the work. It did not want McKenzie's claim still pending while it made other arrangements. The fact that Maynard accomplished this with the expenditure of fewer hours than the size of the contingent fee warranted does not trouble the Court, because there is no proof that Maynard knew he could settle the case as satisfactorily when he undertook the representation.

That is not to say that the Court feels comfortable with the result. Perhaps the more preferable fee arrangement would have been a contingent fee based on a sliding scale.

■ But the Court, having found that the fee arrangement was not clearly excessive, and finding no fraud on Maynard's part, should not substitute its own view of what the fee should have been, for that which was freely arrived at by the parties themselves. Where the parties have their own contractual arrangement there is a "strong judicial reluctance to enforce the terms of a judicially fashioned bargain upon the parties." Dunn v. H. K. Porter, Inc., 602 F.2d 1105, 1111 (3d Cir. 1979).

## CONCLUSION

The plaintiff has not met its burden of proof. Accordingly, on the basis of the Findings of Fact made herein, the Court will dismiss the complaint with prejudice. As to any award of attorney's fees and other costs, after careful consideration of all of the circumstances, the

213

Court will exercise its discretion under 5 V.I.C. § 541 to direct that each party will bear its or his own fees and other costs.

## JUDGMENT

THIS MATTER came before the Court for nonjury trial. All parties appeared personally and by counsel, and presented evidence. The Court having filed its Memorandum Opinion of even date herewith, now therefore it is

ORDERED, ADJUDGED AND DECREED:

THAT plaintiff's complaint be and the same is hereby DISMISSED, with prejudice and further

THAT for the reasons stated in the Court's opinion, each party bear its or his own costs, including attorneys' fees.